Dolan, J.
CASE STATUS AT TRIAL
Five separate cases were filed as a result of actions taken by the Falmouth Zoning Board of Appeals (Board) in the Fall of 1994. All five matters dealt with the same locus and the decisions of the Board issued on September 30, 1994, (Ex. no. 19) and October 3, 1994 (Ex. no. 2) respectively. Jurisdictionally, all of the cases constitute appeals pursuant to G.L.c. 40A, §17.
Three of the cases were consolidated for trial as the evidence, findings and rulings would be germane to the same subject matter. The remaining two actions were continued with the possibility that the appeals might be rendered moot as a result of the Judgment entered in the consolidated cases.
In the matter of Wellesley H. Jonah et al v. Falmouth Zoning Bd. of Appeals (No. 94-811), the property owner, Jonah, appealed from a decision of the Board upholding the denial of a building permit application by the building inspector. (Ex. no. 2—Appeal no. 81-94.)
Contemporaneous with Jonah’s appeal to the Board from the denial of the building inspector (No. 94-811), Jonah brought a petition before the Board for a modification of a special permit which the Board allowed on September 30, 1994. (Ex. no. 19—Appeal no. 82-94.) The allowance of the modification of the special permit carried terms and conditions that the owner had not proposed nor agreed to and that appeal, not from the allowance but from the terms and conditions, is the subject matter of the two cases severed from this trial.
Upon the Board’s allowance of the modification of the special permit, the Board of Selectmen and the Planning Board appealed the decision of the Zoning Board in the case of Bd. of Selectmen et al. v. Falmouth Zoning Bd. of Appeals (No. 94-814). Individuals claiming status as aggrieved persons brought a separate action appealing the same decision of the Board allowing the special permit; case of James E. Salthouse et al. v. Falmouth Zoning Bd. of Appeals (No. 94-816).
DECISIONS OF THE BOARD
On the owner’s appeal to the Board arising out of the denial of an application for a building permit by the building inspector (Ex. no. 2 — Appeal no. 81-94), the owner predicated his appeal on the theory that the application for interior alterations to the structure was protected by §240-3C(2-b) of the 1994 Zoning By-laws (Ex. no. 1 ) which provides for interior alterations of nonconforming structures without a special permit. Therefore, the owner submitted that he was not obliged to seek a special permit before the Board and *255 that the building inspector erred in denying him a building permit for the interior alterations. As noted previously, the Board upheld the decision of the building inspector.
While not agreeing that a special permit was required, the owner’s prospective tenant, John Holland, filed an application for a modification of a special permit pursuant to §§240-3C and 240-212 of the 1994 Zoning By-laws. (Ex. no. 19—Appeal no. 82-94.) The Board held hearings on both matters and took evidence on the issue of the modification of a special permit. The special permit to be modified was granted by the Zoning Board in 1988. (Ex. no. 11—Appeal No. 69-88.)
The applicant sought to have two restaurants operational on the site and submitted a number of alternate plans for seating on the first and second floors. Among other conditions allowing the modification of the special permit, the Board restricted the operation to one restaurant and specified the number of seats on the first and second floor.
The thrust of the controversy and objections to the Board’s decision revolve around the nature and the form of the restaurant sought to be operated by the applicant, Holland. John Holland’s proposal is to operate a McDonald’s restaurant on that site in a form that will comply with the town’s definition of a conventional restaurant. The opponents contend, that the proposal is a fast food restaurant despite its hybrid form and that fast food restaurants are prohibited in that zone.
THE LOCUS AND ITS HISTORY
The site of the subject building is at the comer of Railroad and Luscombe Avenues in the Woods Hole section of the Town of Falmouth. The Woods Hole section of this town is at the end of a peninsula accessed for the most part by Woods Hole Road, a two-lane residential road running for a distance of approximately 4 miles from its connection to Route 28.
Woods Hole is the site of a number of marine or fishery related operations or institutions. However, the largest operation is the terminal facility operated by the Steamship Authority which provides year-round ferry service for freight, private motor vehicles and passengers to the islands of Martha’s Vineyard and Nantucket. The subject locus is located diagonally across the street from the Steamship’s terminal building.
The first zoning by-laws for the town of Falmouth were adopted in 1926. Prior to the adoption of said by-laws, a structure on the subject locus had been operating as a restaurant.
Upon adoption of the by-laws, the site at the comer of Luscombe and Railroad Avenues was designated a B-1 zoning district. Conventional restaurants are permitted uses as of right within B-l districts.
The structure on the site as it existed prior to the adoption of the zoning by-laws occupied almost 100% of the lot. Maximum lot coverage permitted for structures in the B-l district at present is 70%.
The structure is nonconforming as to the lot coverage requirements for that zone. As it preexisted the adoption of the zoning by-laws, it is a preexisting, nonconforming structure.
In 1988, the owners of the structure known as the Leeside Restaurant, Wellesley and Nancy Jonah, applied for a special permit for exterior and interior alterations; the premise being that the structure was preexisting and nonconforming under G.L.c. 40A, §6. The pertinent provisions of the zoning by-law in 1988 relied upon by the petitioners were §§7300 and 1222.
The Board granted the special permit which allowed extension of the restaurant use to the second floor after exterior and interior renovations with office space use in a loft area. The altered structure followed the original footprint on the lot coverage with two exceptions permitted so as to conform with code and handicapped access.
The town granted either a license or easement for the construction of an outside handicapped ramp which encroached, in part, on the town-owned sidewalk and the construction of an elevator shaft was required for access to the second floor.
In summary, the 1988 special permit allowed the alterations with restaurant use on both the first and second floors and by special conditions set a maximum capacity for 86 persons on the first floor and 100 persons on the second floor. (Ex. no. 11.)
In a decision of the Board (Ex. no. 10 — Board No. 68-88) it was noted that expansion of the restaurant to the two floors would impact on parking. Nevertheless, the Board invited the applicant to apply for a special permit under §1222 of the zoning by-laws if parking requirements could not be met.
No off-strefet parking had ever been available at the site during the years of its operation and as noted previously, the lot coverage of the structure was almost 100%. Specific exceptions were made for buildings, structures and land uses in existence prior to April 2, 1979, provided that the same were not enlarged or changed to increase their parking needs. (Ex. no. 12—§5210.)
The Board, cognizant of its discussion of parking requirements in Appeal No. 68-88 (see Ex. no. 13), granted the petitioner’s special permit and essentially applied the rationale for parking waivers under §5200.
The 1988 decision of the Board granting the special permit was not appealed by abutters or by other town boards.
The inclusion of evidence on the Board’s decisions in 1988 was permitted at this trial and referenced within these findings for the purpose of tracing the *256 historical development of the site. There was some attempt to revisit the merits of the Board’s decision in 1988 at this trial by the opponents of the 1994 decisions. Neither the merits nor the propriety of the Board’s decisions rendered in 1988 are proper subject matters for review on this appeal.
THE SUBJECT MATTER OF THE 1994 APPEALS
Since the 1988 renovations, the owner, Jonah, has operated the Leeside Restaurant as a bar/restaurant on the first and second floors. The first floor also accommodates a deli counter.
As the business continued, the patronage was divided about half and half as to the consumption of alcoholic beverages and the consumption of food. There was some “takeout” of food. For whatever reason, the business during the regular hours for lunch and dinner was relatively slow considering the allowed seating capacity of 186. It is noted that the 1994 occupancy permit issued by the town reflects 68 persons for the first floor and 50 persons for the second floor for a total of 118. (Ex. no. 30.) The exception to the diminished business activity occurred or occurs one night a week between the hours of 10:00 p.m. to 1:00 a.m., with music and dancing apparently enticing customers to the extent that the Leeside’s capacity was described by a former employee at this trial as being on occasion “wall to wall."
John Holland, a resident of Mashpee and owner of six restaurants operated under franchise and license agreement with McDonald’s Corporation, proposed that Jonah lease the first floor of the Leeside Restaurant to him for the operation of a McDonald’s restaurant. The proposal envisioned that the first floor of the Leeside operate as a McDonald’s with the Leeside occupying the second floor as a bar and restaurant in much the same form as in the past.
The lease for the property is between McDonald’s and the owner of the building and the franchisee is responsible for the equipment and pays rent to McDonald’s.
Upon inquiry as to allowable uses in a B-1 district, Holland became aware that conventional restaurants were allowed in B-1 districts as a matter of right and that fast food restaurants as defined by the Falmouth Zoning by-law were not permitted in B-1 districts.
The by-law defines a conventional restaurant as:
an establishment in which food is prepared and served and customers’ orders are taken and served at dining tables. A single inside take out station may be considered accessory to a “conventional restaurant.”
(Section 240-13.)
A fast food restaurant is defined as:
establishment for the immediate sale of food or drink prepared on or off premises and served in disposable containers or wrappers for the consumption on or off premises unless such sales are wholly incidental to a conventional restaurant or other use such as a grocery or convenience store or food market or other use defined in this chapter. Service is usually cafeteria style or from a serving counter. Such establishment may include inside seating but table service is usually not provided or only incidental. All restaurant establishments providing in-car drive-through service are included in this definition.
(Section 240-13).
Holland devised a plan for this McDonald’s restaurant by creating a method of operation by which food was to be prepared and served to the customers’ order with individuals choosing to be seated being served by waitresses and those electing take out to be served in a slightly different form. He determined that these changes and the fact that the food would not be precooked as in other McDonald’s restaurants met the criteria of a conventional restaurant within the by-law.
Jonah as owner of the building, applied for a building permit for interior renovations to the first and second floors on the basis that the plan conceived by Holland constituted a conventional restaurant. Jonah’s application relied upon §240-3(2)(b) which states,
Pre-existing Structures and Uses
Interior alterations of any otherwise conforming structure which does not change the nature of, nor increase the intensity of, a nonconforming use, and interior alterations of pre-existing nonconforming structures for use or uses which are otherwise allowed by zoning. (Emphasis supplied.)
A number of meetings had taken place with the building inspector prior to the submission of the application. (Ex. nos. 3 and 4.) The import of the meetings was to explain the nature of the operation of the McDonald’s in the format of a conventional restaurant and to provide data. The building inspector was provided with three sites of similar McDonald’s restaurants where he could visit and observe the operations.
After examining the data and visiting the similar sites, the building inspector denied Jonah’s application (Ex. no. 5) giving three reasons as the bases for denial. The inspector determined that the proposed seating of twenty-five tables reflected that the percent of seated customers would be very low compared to take out customers so that take out would not be incidental to the seated patronage as would be the case in a conventional restaurant. Based on the menu, format and seating, the building inspector opined that it would be a fast food restaurant.
The inspector further determined that since the building was under a special permit that had been issued in 1988 with three conditions, that a special *257 permit would be required if any of the said conditions were to be modified (see Ex. no. 5).
The 1988 special permit allowed the operation of one restaurant on two floors and the proposal placed before the building inspector was for two restaurants: one on each floor.
Jonah appealed the building inspector’s denial and at the same time his prospective tenant filed for a modification of the special permit. The Board held a public hearing on both matters on June 29, 1994. By the time the hearing was held, a variety of altered plans for seating on the first and second floors had been prepared by the petitioner, Holland, with the seating for the floor used by McDonald’s ranging from fifty-three to sixty-three seats as opposed to the original twenty-five seats submitted to the building inspector. The respective plans were submitted to the Board at the public hearing. (Ex. no. 9.)
The Board upheld the building inspector’s denial of the building permit agreeing that the special permit process was required since the building was under the 1988 condition of one restaurant operating from that site and further that the decision of the building inspector on the seating capacity of twenty-five persons rendered the proposal a fast food restaurant with incidental table service. (Ex. no. 2 — Appeal no. 81-94.)
After hearing, the Board allowed the special permit subject to seven conditions:
1) Only one business may operate from the site.
2) There shall be a minimum of 65 seats in the restaurant, seating allowed on the first and second floors.
3) There shall be only one take out station on the site accessory to the restaurant as allowed under the by-law.
4) There shall be no liquor served on the premises.
5) The only signs allowed on the site shall be that shown on the submitted plan, as outlined herein.
6) The operation of the restaurant shall be as represented a sit-down restaurant with food prepared to order, full waitress and table service with no pre-packaged food.
7) Deliveries shall be made through the side door anticipating one or two major deliveries per week. There shall be no deliveries made during peak traffic hours of the Steamship Authority schedule. (Ex. no. 19 — Appeal no. 82-94.)
In its decision on the modification of the special permit, the Board considered the format of the proposed McDonald’s and its compliance with the definition of a conventional restaurant together with the signage on the building, the number of tables for seated customers, the traffic impact both vehicular and pedestrian, the intensity of the use, and the previous waiver of off-street parking by the Board issuing the 1988 special permit.
A plan dated June 14, 1996, submitted by Holland at trial known as the “Special Permit Plan” (Ex. no. 26) reflects seating for 86 persons on the first and second floors combined as one restaurant operated under the name of McDonald’s Cafe. Holland’s proposal for operation has a hostess receiving the customers as they enter and if they wish to be seated, they are directed to a table where a waitress/waiter takes their order which is electronically recorded and registers in the kitchen area. The food is paid for in advance of service. The customers seeking take out are directed to a waiting area where their order is taken in a similar fashion.
The food is cooked as it is ordered. The cooking methods and equipment allow for very rapid processing and the cooking time can be as short as three minutes. The order is brought to the table or to the take out customer by the waitress/waiter. The “turnover” time at the tables is expected to be a total of ten minutes with the restaurant capable of serving a capacity of 65 to 70 at any one given time. Historic data from McDonald’s Corporation indicates that 70% of its customers are sit-down or table service.
Argument relating to the rapidity of cooking and service being “quick” or “fast” does not re-define a fast food restaurant as its definition is embodied in the zoning by-laws. Within the by-law definition, no mention is made of the time factor involved in the preparation of the food, the service or the turnover rate.
There are close to 2,000,000 passengers per year that pass through the Steamship Authority’s terminal at Woods Hole. A minimum of 355,000 passenger cars plus 61,000 trucks per year use the Woods Hole Road into the staging area at the terminal site. The Authority has been forced to create a number of satellite parking lots outside of the Woods Hole area with shuttle buses transporting passengers to the terminal in order to alleviate the lack of available parking for persons using the ferry. The front lot of the Authority which was formerly used as a parking lot for private cars has been changed into a staging area to hold cars waiting to get on the ferry.
In front of the terminal building on Luscombe Avenue just across the street from the Leeside are located bus stops and taxi stands. The Authority’s shuttle buses which now number 12 and soon will be increased to 16 or 18, line up at the base of the staging area. Charter buses and local transit buses also use the site to deliver or pick up ferry passengers
A daily passenger rate of 10,000 with a high-end number of 16,000 depending on the season, flows through the terminal. It is this group of passengers that Holland seeks to acquire as customers for the McDonald’s Cafe figuring that an estimated 8% or 9% of same will use the restaurant.
Based upon statistics from McDonald’s Corporation, Holland anticipates that the restaurant will av *258 erage 921 transactions per day. The number of persons would be higher than the numbered transactions. The number of persons would be more highly concentrated during the traditional breakfast, lunch and dinner hours. Despite the opinion of the traffic engineer who opined that this restaurant would generate between 5% to 10% of its business as vehicular trips solely for the purpose of eating at McDonald’s or obtaining a take out order, that figure does not comport with the reality of the product or the conditions.
The parking strictures of the Authority are well established. Luscombe Avenue has 12 metered parking spaces and Railroad Avenue has 9 metered spaces. This restaurant is not a drive-through facility and has no off-street parking. In addition, its McDonald’s menu is a limited one compared to other McDonald’s restaurants. There exists a McDonald’s restaurant in the Teaticket section of Falmouth which has off-street parking and a drive-through window. The food is identical except that the Teaticket facility has a broader range of items on its menu. It is doubtful that this restaurant will generate much, if any, vehicular traffic outside of Woods Hole.
The traffic impact will be pedestrians crossing the street from the terminal building and the Steamship parking area to the subject locus.
The intersection of Luscombe and Railroad Avenues is an uncontrolled intersection with no crosswalks, lights or other safety controls. Luscombe Avenue provides one access to the terminal. The Steamship parking lot has its exit for the cars and trucks located on Railroad Avenue which is a one-way street. A bike path adjacent to the Steamship lot exits on Railroad Avenue bringing cyclists into the traffic pattern.
The effect of the restaurant at this site based upon the estimated business will generate about 1,700 to 2,000 walking trips; that is back and forth across Railroad Avenue or Luscombe Avenue. There was no evidence of any studies done to show the present number of walking or crossing trips by pedestrians at that intersection. There are other restaurants and shops located in that area which would cause individuals to cross that intersection. For example, on Luscombe Avenue a sandwich and ice cream shop is a contiguous abutter to the Leeside.
The opponents submit that the pedestrians crossing from the Steamship facilities will not cross at the intersection but will cross Railroad Avenue diagonally because of the location of the entrance/exit on the subject building. They further submit that the cyclists will be dropping their bicycles on the sidewalk to go into the restaurant, that restaurant employees will use the metered parking spaces and that customers of the restaurant who are driving will parkin the “No Parking Loading Zone" in order to get take out orders. All of these conditions, it is submitted, lead to a potentially hazardous pedestrian traffic situation. Nevertheless, almost all of the submissions referred to adequate policing and control of the intersection and area. Using as an example the fact that cyclists turn the wrong way when exiting on Railroad Avenue in order not to have to pedal up the grade is a policing function that is already a hazardous situation whether or not McDonald’s ever operates from that site.
There is no doubt that the presence of this restaurant will generate more street crossings at that intersection by pedestrians who are already in Woods Hole to use the ferry. The opponents have not shown that the situation will be hazardous provided that adequate policing of the area is conducted.
Four individuals brought complaint no. 94-816, claiming status as aggrieved persons.
James Salthouse operates Jimmy’s as a sandwich, ice cream shop and package store at 22 Luscombe Avenue, Parcel no. 10. He is a contiguous abutter to the subject building. The main focus of this abutter’s complaint is the action of the Board in granting the 1988 permit and its ramifications on his property after the subject building was altered. Structural items such as roof lines creating water run-off, wash from filters falling on the abutter’s roof and the elimination of an alleyway between the two buildings after alteration with a claim of property encroachment are not issues to be considered in this case. Mr. Salthouse considers the present structure to be a nuisance. He objects also to the handicapped ramp leading into the Leeside as it encroaches on the sidewalk despite the fact that its encroachment was allowed by license or easement from the town during the 1988 permit proceeding. This abutter suggests that the presence of McDonald’s Cafe will create congestion on the sidewalk, presumably on Luscombe Avenue. Mr. Salt-house places tables and chairs in front of his establishment for the use of his patrons during seasonal weather. Although Salthouse maintains that the outside tables are on his land, the same take up the same degree of space as the handicapped ramp for the Leeside. Finally, Mr. Salthouse submits that there is no place for his customers to park. The matter of parking and lack of same for this area has been covered in these findings.
Manuel Diaz owns a bakery at 10 Water Street, Parcel no. 15, known as “He in the Sky.” The bakery serves pastries and small lunches. Water Street is a main street through town and is not directly at the locus intersection of the subject building. Diaz has alleviated his parking problems by an arrangement with a neighboring bank for use of a portion of its lot. The concern of Mr. Diaz rests with the nature of the business proposed by Holland which Diaz considers to be a fast food restaurant no matter how it is cloaked. He chose Woods Hole for his business because he was looking for a place with an international community and he believes that fast food restaurants have ruined the Teaticket section of Falmouth. In summary, Diaz *259 maintains that the presence of a McDonald’s restaurant will devalue his family’s property.
Cynthia Simpson is a direct abutter on Railroad Avenue, Parcel no. 11, which is the site of a former gas station and presently run by Simpson as a parking-for-fee lot under a special permit granted in 1992 (Ex. no. 27). As the permit requires that a 13-foot fire lane be left open in her parking lot, Simpson is concerned that patrons using the proposed McDonald’s cafe next door will block her fire lane and place her permit in jeopardy. She notes the obvious that parking is at a premium in that area and she complained that she already had one car trespassing in the fire lane. She admits that she would have the right to have any trespassing vehicles towed from her property. Simpson’s other concern was the potential presence of litter and papers on her parking lot ostensibly from the McDonald’s Cafe. Unlike her own operation, she believes that a McDonald’s would ruin the image of Woods Hole.
Joyce Stratton resides at 22 Water Street, Parcel no. 17, and operates a gift shop/book store on the lower floors. She is an abutter of an abutter. Her opposition varies from potential litter which she admits is already a problem on her property and to the odors from the vents which are noticeable during the lunch and dinner hours. The Leeside produces a noisy crowd when it closes down at 1:15 a.m. The Holland proposal has McDonald’s closing at about 10:00 p.m. She further asserts that Woods Hole is a special environment almost like a college campus and that McDonald’s will impact upon the quaint ambience.
DISCUSSION and RULINGS
Standard of Review
When a matter is appealed pursuant to G.L.c. 40A, §17, the Trial Court hears the matter “de novo” and renders facts independent of the Board’s decision. The Board’s findings and decisions have no evidentiary weight. Joseph’s v. Bd. of Appeals of Brookline, 362 Mass. 290 (1972). To the degree that the decisions of the board are referenced within these findings, the inclusion of same are for the travel of the case and the predications for the respective appeals.
Once the trial findings have been made, it is the duty of the judge to determine the legal validity of the Board’s decision. The legal validity of the Board’s decision rests upon whether the Board has exceeded its authority or acted unreasonably, capriciously or arbitrarily in approving a special permit or otherwise based its decision on legally untenable grounds. Federman v. Bd. of Appeals of Marblehead, 35 Mass.App.Ct. 727 (1994). It is not for the Trial Court to decide whether the decision of the Board was the right or wise decision. It is not the wisdom of that action: it is only its validity. Kiss v. Bd. of Appeals of Longmeadow, 371 Mass. 147 (1976).
In granting a special permit, a board has a range of administrative discretion and power that is not shared by the Court sitting in review of the board’s approval of a special permit. The Court is not permitted to “invade the field of administrative discretion by substituting its judgment for that of the board.” Pendergast v. Bd. of Appeals of Barnstable, 331 Mass. 553, 559 (1954).
Case No. 94-811—Wellesley H. Jonah et al. v. Falmouth Zoning Board of Appeals
I find and rule that the board acted fairly and within its discretion in upholding the building inspector’s denial of the building permit
The subject locus is a preexisting, nonconforming structure solely due to its 100% lot coverage that pre-dated the adoption of zoning by-laws in 1926. That was the status of the locus in 1988 and that is its status today.
The Board granted a special permit to the Leeside Restaurant in 1988, allowing it to change from a restaurant operating on one floor to a restaurant operating on two floors. The allowance created a specific condition on that special permit. The actions taken by the Board in 1988 are not and cannot be the subject of review in the cases before this Court.
The 1994 proposal by Jonah was for interior alterations. Nevertheless, the proposal before the building inspector contained a modification of the special condition that the structure be used as one restaurant on two floors and not two restaurants. Where a condition existing under a special permit is to be modified, changed or altered, it falls within the authority of the board to grant or deny same. The board of appeals has inherent authority to modify the conditions of a special permit “in the exercise of its sound administrative authority.” Huntington v. Zoning Bd. of Appeals, Hadley, 12 Mass.App.Ct. 710, 719 (1981).
With the authority to modify a condition of a special permit reposing solely in the board, the building inspector correctly denied Jonah’s application for a building permit and the board correctly upheld the building inspector’s decision.
Case No. 94-816—Salthouse, et al. v. Falmouth Zoning Board of Appeals
I find and rule that the four individuals in the above matter lack standing as aggrieved persons. The four persons as plaintiffs in the above matter all stand in the position of parties in interest within the purview of G.L.c. 40A, §17. In this respect, there is a presumption that is afforded “parties in interest.” In this case, the plaintiffs’ standing as aggrieved persons has been challenged. Once challenged, the presumption may be rebutted by the evidence at trial.
“A plaintiff is a person ‘aggrieved’ if he suffers some infringement of his legal rights.” Marashlian v. Zoning Bd. of Appeals of Newburyport, 421 Mass. 719, 721 (1996) quoting Circle Lounge & Grill, Inc. v. Bd. of Appeals of Boston, 324 Mass. 427, 430 (1949).
*260 The four plaintiffs “did not meet their burden of proving they were parties ‘aggrieved’ where they did not present evidence that demonstrated a reasonable likelihood of tangible, as opposed to speculative, harm to their property or to any other recognized legal right or interest...” Barvenik v. Bd. of Aldermen of Newton, 38 Mass.App.Ct. 129 (1992).
The issues raised by the plaintiffs are speculative and for the most part deal with proper enforcement of the zoning code after the fact and by the enforcement agent for the town. For example, they do not believe that the prospective tenant, Holland, will operate the restaurant in the form proposed. As noted in Barvenik, supra at 132, “Speculative and unspecified fears . . . are . . . insufficient basis for aggrievement ...” The Court in Barvenik, supra, sets forth the predication that a plaintiff “must provide specific evidence demonstrating a reasonable likelihood that the granting of a special permit will result, if not in a diminution in the value of his property, at least in his property or legal rights being more adversely affected by the activity authorized by the permit them (a) they are by present uses and activities or (b) that would be as a result of uses and activities permitted as of right on the defendant’s locus” at 133.
The presumption accorded the plaintiffs as “parties in interest” being aggrieved persons was rebutted by the evidence at trial. As these plaintiffs lack standing, this complaint should be dismissed.
Case No. 94-814—Bd. of Selectmen. et al. vs. Falmouth Zoning Bd. of Appeals
The special permit-granting authority given to zoning boards of appeals is imbued with the term “discretion." The Superior Court in reviewing a decision of a board in granting a special permit is not invested with the same discretionary power as the board. Old Colony Counsel-Boy Scouts v. Zoning Bd., 31 Mass.App.Ct. 46 (1991). The decision of the reviewing court is limited to the validity of the board’s actions and not to its wisdom or its popularity or lack thereof.
The board in this case considered its by-laws and the definition of a restaurant which is a use as a matter of right in that district. The board determined that as crafted by ihe petitioner, Holland, that the operation fell within the by-law definition of restaurant and not a fast food restaurant defined differently under the zoning by-laws. The nonconformity of the site due to building coverage is the same as it has always been and will not change with this operation. The special permit-granting authority permits a board to set reasonable terms and conditions with the grant of a special permit providing that its actions are in harmony with the general purpose and intent of its by-laws.
Keeping in mind the discretion with which a board is invested, the decision cannot be disturbed unless it is based on an untenable ground or is arbitrary or capricious. Federman v. Bd. of Appeals of Marblehead, 35 Mass.App.Ct. 727 (1994).
I find and rule that the decision of the Falmouth Zoning Board of Appeals in granting the modification of a Special Permit with terms and conditions was not arbitrary, capricious nor unreasonable and was based upon tenable grounds in the application of the zoning by-laws for the town of Falmouth. In that respect, the decision of the Board is affirmed.
ORDERS FOR JUDGMENT
Based upon the foregoing findings and rulings, the Clerk’s Office is to enter the following Judgments as individual Judgments within each case.
No. 94-811, Wellesley H. Jonah et al. v. Falmouth Zoning Board of Appeals
The decision of the Board upholding the denial of a building permit application by the building inspector is AFFIRMED.
Case 94-814, Bd. of Selectmen et al. v. Falmouth Zoning Board of Appeals
The decision of the Board granting the modification of the Special Permit is AFFIRMED.
No. 94-816, Salthouse et al v. Falmouth Zoning Board of Appeals
Judgment of Dismissal is to enter against the plaintiffs for lack of standing.